[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-16334

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 13, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 05-01656-MD-T-27-TBM

In Re: CP SHIPS LTD. SECURITIES LITIGATION,

_____

GEOFFREY GOTTFRIED, individually
and on behalf of all others
similarly situated,
BILLY R. HOOD,
JAMES W. NELSON, individually
and on behalf of all others
similarly situated,
RAYMOND TYLER, on behalf of
himself and all others
similarly situated,
KIRVIN HENDRIX, et al.,

Plaintiffs-Appellees,

versus

ALLEN GERMAIN,

Interested Party-Appellant,

CP SHIPS LTD.,
RAY MILES,

IAN WEBBER,
FRANK HALLIWELL,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(August 13, 2009)

Before WILSON, KRAVITCH and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

Objector-Appellant Allen Germain appeals from the district court's final order approving the settlement of a securities class action lawsuit. Germain, a class member in the instant action, is also a member of a class pursuing related litigation in Canada ("Canadian Actions"). Germain is a Canadian citizen who purchased his securities on the New York Stock Exchange ("NYSE"). Germain argues that the district court lacked subject matter jurisdiction over the claims of foreign stock purchasers or, in the alternative, should have declined jurisdiction as a matter of comity. In addition, Germain argues that notice was inadequate and that the settlement is not fair, reasonable or adequate. For the reasons set forth below, we affirm the decision of the district court.

FACTS

Defendant-Appellee CP Ships Ltd. ("CP Ships" or "the Company") is a prominent container shipping company. It operates in several countries. The Company is organized under the laws of Canada and headquartered in London or Gatwick, England. Although officially headquartered in England during the class period (January 29, 2003 to August 9, 2004) ("Class Period"), crucial headquarters activities – including the relevant operations and personnel that were central to the fraud (i.e. the accounting department and executive offices) – were located in Tampa, Florida. These accounting operations were micromanaged by Defendant Halliwell, first in his capacity as Chief Operating Officer and later in his capacity as Chief Executive Officer. Halliwell was based in, and worked out of, the Tampa office during the Class Period. Roughly eighty percent of CP Ships' shares are traded on the Toronto Stock Exchange ("TSX") and roughly twenty percent are traded on the NYSE.

From 1993 to 2003, CP Ships acquired nine different businesses. Each business retained its own financial accounting system. In 2004, CP Ships instituted a single accounting platform ("SAP") over most of its businesses. After the SAP implementation, the Company announced that the transition had caused it to understate its operational costs. The Company's stock price dropped

approximately 22.4 percent on the NYSE and 21.5 percent on the TSX. The allegations in the instant case and the Canadian Actions are both based on this occurrence.

The instant class action asserts claims for securities fraud in violation of Section 10(b) and 20(a) of the Exchange Act. On April 5, 2007, the district court dismissed the Complaint for failure to meet the heightened requirements for pleading scienter under the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The plaintiffs appealed to this Court. While the appeal was pending, the parties agreed to settle for $1.3 million. This is a small fraction of the original losses of $130 to $180 million alleged in the Complaint. The settlement class includes the claims of some foreigners but specifically excludes the claims of Canadian citizens who purchased CP Ships stock on the TSX.

After notices of settlement were published, an objector, Earl Downey, argued that the settlement would prevent some members of the Canadian class from pursuing their action in Canada. The district court ultimately issued an order concluding that Downey lacked standing to challenge the settlement. Nonetheless, the plaintiffs issued a supplemental notice ("Supplemental Notice") addressing some of his concerns. It included additional information about the Canadian Actions, including the contact information of the counsel in the Canadian Actions.

4

There was an opportunity to opt out of the class after the Supplemental Notice.

On September 4, 2008, Appellant-Objector Allen Germain filed the instant objections to the settlement ("Objections"). The district court overruled the Objections and approved the settlement. Germain appealed. We first address subject matter jurisdiction, and then address Germain's merits challenges (i.e. to the notice and to the fairness of the settlement).

## STANDARD OF REVIEW

The existence of subject matter jurisdiction is a question of law we review de novo. Pintando v. Miami-Dade Hous. Agency, 501 F.3d 1241, 1242 (11th Cir. 2008) (per curiam). This Court reviews a district court's approval of a settlement agreement for an abuse of discretion, Christo v. Padgett, 223 F.3d 1324, 1335 (11th Cir. 2000), bearing in mind that "[p]roponents of class action settlements bear the burden of developing a record demonstrating that the settlement distribution is fair, reasonable and adequate," Holmes v. Continental Can Co., 706 F.2d 1144, 1147 (11th Cir. 1983).

## DISCUSSION

### A. Subject Matter Jurisdiction

First, we must determine whether Germain raised a facial or factual attack on the existence of subject matter jurisdiction. Then, we will address the question of

5

jurisdiction itself.

### 1. A Facial Challenge

"A litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance." Kontrick v. Ryan, 540 U.S. 443, 455, 124 S. Ct. 906, 915 (2004). However, "the parties may admit the existence of facts which show jurisdiction, and the courts may act judicially upon such an admission." Ry. Co. v. Ramsey, 89 U.S. 322, 327 (1875); see also United States v. Harty, 930 F.2d 1257, 1261 (7th Cir. 1991) ("Although challenges to subject matter jurisdiction may be raised at any time, the appellants' argument . . . is a factual challenge not raised before the district court. This court has repeatedly stated that arguments raised for the first time on appeal are waived.") (internal citations and quotations omitted).[1]

Thus, there are two types of challenges to the existence of subject matter

---

[1]     Accord Meyer v. Berkshire Life Ins. Co., 372 F.3d 261, 265 (4th Cir. 2004) (concluding that defendant-appellant could admit facts establishing that it was an ERISA fiduciary, although that conclusion was inextricably intertwined with the district court's subject matter jurisdiction); Ferguson v. Neighborhood Hous. Servs. of Cleveland, Inc., 780 F.2d 549, 551 (6th Cir. 1986) ("The rule that jurisdictional facts which are admitted by the parties may establish subject matter jurisdiction over a case is a salutory one that promotes speedy and inexpensive litigation."); Verzosa v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 589 F.2d 974, 977 (9th Cir. 1978) (per curiam) ("It is well settled that one may stipulate to facts from which jurisdiction may be inferred.") (quotation omitted).

jurisdiction. "A 'facial attack' on the complaint requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." McElmurray v. Consol. Gov't of Augusta-Richmond County, 501 F.3d 1244, 1251 (11th Cir. 2007) (internal quotations and alterations omitted). "'Factual attacks,' on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered." Id. (internal quotations omitted). In a factual challenge, "the district court must give the plaintiff an opportunity for discovery and for a hearing that is appropriate to the nature of the motion to dismiss." Williamson v. Tucker, 645 F.2d 404, 414 (5th Cir. 1981).[2]

We conclude that Germain raised only a facial challenge before the district court. Germain did not advise the district court that he intended to raise a factual challenge. Nor did Germain request discovery or an evidentiary hearing. It is also clear from the transcript of the Final Approval Hearing that Germain was raising only a facial challenge to the Complaint.[3] Furthermore, the district court's opinion

---

[2]   Fifth Circuit decisions issued before October 1, 1981 are binding precedent in this Court. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[3]   The following excerpt from the Final Approval Hearing is representative of the dialogue:

expressly treats Germain's attack as facial, and he did not file a motion for

reconsideration stating that he intended to mount a factual attack on the

Complaint.[4]

Furthermore, Germain has not at any time expressly challenged any facts

determinative of subject matter jurisdiction. As discussed below, the allegations in

the Complaint establish that substantial fraudulent activity occurred at CP Ships'

Tampa, Florida, accounting office. On appeal, Germain challenges only facts

tangential to that conclusion. There is no evidence in the record to suggest that the

district court in fact lacked subject matter jurisdiction.[5] Cf. Rubin v. Buckman, 727

F.2d 71, 72-73 (3d Cir. 1984); Eisler v. Stritzler, 535 F.2d 148, 150-52 (1st Cir.

---

THE COURT: And, obviously, the question is why are these allegations not sufficient to satisfy the conduct part of that conduct effects analysis that the Berger court discusses.

[COUNSEL FOR GERMAIN]: Yes, Your Honor. The problem with all of those allegations that were just recited, Your Honor, is that they are not instances of fraudulent conduct here in the U.S.

(emphasis added).

[4] Even on appeal, Germain did not advise this Court of his intent to raise a factual challenge to subject matter jurisdiction until he filed his Reply brief.

[5] At oral argument, Germain made much of the fact that the headquarters of the Company was in England and that the false or misleading statements were disseminated from England. Those facts, however, are not inconsistent at all with the alleged facts that the Company's accounting department, and the relevant operations and personnel central to the fraud, were located in Tampa. Especially in light of the fact that Germain never advised the district court that he was making a factual challenge, the mere assertion of such facts cannot be deemed to have put the district court on notice that Germain was making a factual challenge.

1976).[6]  We will not remand simply to allow Germain to embark on a "fishing

expedition."

Accordingly, we turn to Germain's facial attack on the existence of subject

matter jurisdiction.  Although Germain himself, a Canadian citizen, bought his

securities on the NYSE, he not only challenges the district court's jurisdiction over

similar plaintiffs, but also challenges the district court's jurisdiction over other

foreign investors who purchased on the TSX.

### 2.  The Allegations in the Complaint

"It is well recognized that the Securities Exchange Act is silent as to its

extraterritorial application."  Itoba Ltd. v. LEP Group PLC, 54 F.3d 118, 121 (2d

Cir. 1995).  Thus,

> [w]hen, as here, a court is confronted with transactions that on any
> view are predominantly foreign, it must seek to determine whether
> Congress would have wished the precious resources of United States
> courts and law enforcement agencies to be devoted to them rather than
> leave the problem to foreign countries.

---

[6]  In Rubin, the plaintiff revised his original allegation that he was a citizen of Hong Kong after the district court entered summary judgment in favor of the defendant.  727 F.2d at 72-73.  The record in fact indicated that the plaintiff had a United States passport.  Id. at 73. Thus, the Third Circuit remanded for the district court to conduct further discovery on the existence of diversity jurisdiction.

In Eisler, the defendant revised his original admission that he was a citizen of Puerto Rico after the district court entered a default judgment against him.  535 F.2d at 150-52.  The defendant filed an affidavit stating that he was a citizen of California at the time the action was brought.  Id. at 151.  Thus, the First Circuit remanded for a hearing on the existence of diversity jurisdiction.

Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 985 (2d Cir. 1975). The provisions and purposes of the Securities Exchange Act serve as a guide.

The courts have reached two broad conclusions with respect to transnational securities frauds. First, "it is consistent with the statutory scheme to infer that Congress would have wanted to redress harms perpetrated abroad which have a substantial impact on investors or markets within the United States." Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 171 (2d Cir. 2008) (internal quotations omitted). Second, "Congress did not mean the United States to be used as a base for fraudulent securities schemes even when the victims are foreigners . . . ." Bersch, 519 F.2d at 987.

These principles have been distilled into two jurisdictional tests: the "conduct test" and the "effects test." S.E.C. v. Berger, 322 F.3d 187, 193 (2d Cir. 2003). The court asks: "(1) whether the wrongful conduct occurred in the United States, and (2) whether the wrongful conduct had a substantial effect in the United States or upon United States citizens." Id. at 192. "Where appropriate, the two parts of the test are applied together because an admixture or combination of the two often gives a better picture of whether there is sufficient United States involvement to justify the exercise of jurisdiction by an American court." Morrison, 547 F.3d at 171 (internal quotations omitted). We conclude that the

10

Complaint alleges ample facts sufficient to establish subject matter jurisdiction under the "conduct test" over unnamed foreign class members who purchased on the TSX.[7]  Accordingly, we need not address the "effects test."

Jurisdiction exists under the "conduct test" when "substantial acts in furtherance of the fraud were committed within the United States."[8]  Berger, 322 F.3d at 193 (internal quotations omitted).  "[T]he test is met whenever (1) the defendant's activities in the United States were more than merely preparatory to a securities fraud conducted elsewhere and (2) the activities or culpable failures to act within the United States directly caused the claimed losses."  Id. (internal quotations omitted).

The Second Circuit's decision in Berger is instructive.  Defendant Michael Berger formed an offshore investment company ("the Fund") organized under the laws of the British Virgin Islands.  Id. at 188.  The Fund maintained a brokerage

---

[7]     It follows, a fortiori, that the Complaint alleges sufficient facts to establish subject matter jurisdiction over unnamed foreign class members who purchased on the NYSE.

[8]     The parties agreed that the Second Circuit's articulation of the conduct test is appropriate, and we conclude that it has been met.  Therefore, we need not (and do not) decide if a less stringent formulation would also suffice to establish subject matter jurisdiction.  See, e.g., Kauthar SDN BHD v. Sternberg, 149 F.3d 659, 666 (7th Cir. 1998) ("[T]he Third, Eighth and Ninth Circuits . . . to use the Fifth Circuit's words, 'generally require some lesser quantum of conduct.'" (quoting Robinson v. TCI/US West Commc'n Inc., 117 F.3d 900, 906 (5th Cir. 1997))).

account at a broker-dealer located in Ohio and the majority of its assets and securities were held in the United States. Id. Berger, working in New York, created fraudulent account statements and forwarded them to the Fund administrator in Bermuda. Id. at 189. The Fund administrator, operating in Bermuda, relied on these fraudulent calculations to prepare and mail monthly account statements to investors.[9] Applying only the "conduct test," the Second Circuit held "that subject matter jurisdiction clearly exists over Berger's actions." Id. at 194. "Clearly, the fraudulent scheme was masterminded and implemented by Berger in the United States." Id.

The circumstances of the instant case are analogous. CP Ships is a foreign corporation. However, the Complaint alleges that the SAP conversion project occurred in the Company's Tampa, Florida, accounting offices, where personnel – including key executives – knowingly caused costs to be understated. The Tampa offices then transmitted this false data to the Company's foreign offices, where it was incorporated into allegedly false and misleading financial statements that were disseminated from abroad. Accordingly, we conclude that subject matter jurisdiction exists over CP Ships' actions. The allegedly fraudulent scheme was

_____

[9]     The Fund had approximately 280 investors, only a small percentage of whom had addresses in the United States. Id. at 188.

masterminded by Halliwell and other executives operating out of Tampa, and implemented in substantial part by those executives in Tampa.

Germain seeks to dissuade us. Under the "conduct test," Germain asserts: (1) the accounting activity in Tampa was merely preparatory to the creation and dissemination of allegedly false and misleading statements outside the United States; and (2) the creation and dissemination of allegedly false and misleading statements outside the United States (rather than the manipulation of accounting information in Tampa) directly caused the claimed losses. For support, Germain relies on the Second Circuit's decision in Morrison v. Nat'l Aust. Bank Ltd., 547 F.3d 167 (2d Cir. 2008).

In Morrison, the plaintiffs brought a class action against, inter alia, National Australia Bank ("NAB") and its wholly owned American subsidiary HomeSide Lending Inc. ("HomeSide"). The plaintiffs alleged that HomeSide, a mortgage service provider, manipulated its internal books and records and sent false numbers from HomeSide's Florida headquarters to NAB's Australia headquarters – where the allegedly false numbers were incorporated into public statements and disseminated from Australia. Id. at 168-79, 171. The Second Circuit held:

> The actions taken and the actions not taken by NAB in Australia were, in our view, significantly more central to the fraud and more directly responsible for the harm to investors than the manipulation of the

13

numbers in Florida.

Id. at 176. After noting that HomeSide was merely a wholly owned, operational

subsidiary, the court elaborated:

> The responsibilities of NAB's Australian corporate headquarters, on
> the other hand, included overseeing operations, including those of the
> subsidiaries, and reporting to shareholders and the financial
> community. NAB, not HomeSide, is the publicly traded company, and
> its executives – assisted by lawyers, accountants, and bankers – take
> primary responsibility for the corporation's public filings, for its
> relations with investors, and for its statements to the outside world.
>
> . . .
>
> NAB's executives possess the responsibility to present accurate
> information to the investing public and to the holders of its ordinary
> shares in accordance with a host of accounting, legal and regulatory
> standards. When a statement or public filing fails to meet these
> standards, the responsibility, as a practical matter, lies in Australia, not
> Florida.
>
> . . .
>
> In other words, while HomeSide may have been the original source of
> the problematic numbers, those numbers had to pass through a number
> of checkpoints manned by NAB's Australian personnel before
> reaching investors. While HomeSide's rigging of the numbers may
> have contributed to the misinformation, a number of significant events
> needed to occur before this misinformation caused losses to investors.
> This lengthy chain of causation between what HomeSide did and the
> harm to investors weighs against our exercising subject matter
> jurisdiction.

Id. at 176-77. In holding that it lacked subject matter jurisdiction over foreign

plaintiffs who purchased on foreign exchanges, the Second Circuit placed primary reliance on the fact that all the executives with responsibility for ensuring the accuracy of information provided to the investing public operated out of Australia, and all of the actions of those executives in verifying such information occurred in Australia. In addition, the Second Circuit relied upon the "lengthy chain of causation between the American contribution to the misstatements and the harm to investors." Id. at 176. In other words, "those numbers had to pass through a number of check points manned by NAB's Australian personnel before reaching investors." Id. at 176-77.

We conclude that the instant case is distinguishable. The Complaint in this case alleges:

> Defendant Halliwell was Chief Operating Officer and a Director and member of the Executive Committee of CP Ships during the Class Period. From May 2004 through the end of the Class Period . . . Halliwell served as the Company's Chief Executive Officer. . . . He was based in, and worked out of the Company's Tampa offices throughout the Class Period. . . . [D]efendant Halliwell made materially false and misleading statements contained in the Company's releases and/or signed the Company's materially false and misleading SEC filings.

Complaint at ¶ 23. The Complaint continues:

> Although CP Ships is officially headquartered in England, most headquarters operations – including the relevant operations and personnel which were central to the misconduct in this case

15

> throughout the Class Period – were located in the Company's offices in Tampa, Florida.  The Tampa offices contained, <u>inter alia</u>, the Company's accounting department . . . and the executive offices on the thirty-third floor which housed key CP Ships executives, including CEO Halliwell.

Complaint at ¶ 38.  In paragraph 39, the Complaint alleges that the SAP conversion project occurred in Tampa.  This Standard Accounting Platform was implemented in January 2004, and was used in the May 11, 2004, press release to excuse or explain the initial revelation that the financial results for 2003 had to be revised.  This press release is challenged in the Complaint as being false and misleading: it allegedly buried and downplayed the needed revision, both understating the significance thereof, and misleadingly stating that it did not affect the Company's 2004 outlook.  This May 11, 2004, press release, and the related statements and SEC filings, were issued after Halliwell had been promoted from his Chief Operating Officer position to Chief Executive Officer of the Company, and thus at a time when Halliwell, operating out of Tampa, bore the primary responsibility not only for the alleged manipulation of the numbers, but also for ensuring the accuracy of financial information provided to investors.  Indeed, paragraph 41 of the Complaint alleges that "he controlled everything from Tampa."

Thus, we conclude that the instant case is very different from <u>Morrison</u>.  Although the problematic numbers in <u>Morrison</u> may have originated in the United

16

States, all of the executives bearing responsibility to present accurate information to the investing public, and all of their actions in supervising and verifying such information, occurred in Australia. By contrast, in the instant case, not only did the manipulation and falsification of the numbers occur in Florida, the executives with responsibility for ensuring the accuracy of the accounting data operated from Florida. The accounting department for the Company was located in Tampa, and operated under the micromanagement of Halliwell (first in his position as Chief Operating Officer and later as Chief Executive Officer). Although other divisions of the Company's headquarters were located in its official headquarters in England, the headquarters operations "which were central to the misconduct in this case . . . were located in the Company's offices in Tampa." A number of the statements challenged in this Complaint were actually made or signed by Halliwell, who was based in and operated out of Tampa. Although it is true that other challenged statements were made by Defendant Miles or Defendant Webber (who operated out of England) there is no indication in the Complaint that they performed any verification activities with respect to ensuring the accuracy of the information generated in Tampa. In any event, the most that could be said is that they also bore some responsibility in that regard, in addition to the primary responsibility borne by Halliwell in Tampa. Furthermore, in the instant case, and unlike Morrison, the

17

Complaint indicates no lengthy chain of causation between the American

contribution to the misstatements and the harm to investors. Rather, the causation

here was direct and immediate.[10]

Accordingly, we conclude that Morrison is distinguishable, and that the

alleged activity in Tampa represents substantial acts in furtherance of the fraud

which directly caused the claimed losses.[11] We conclude that the district court

properly exercised subject matter jurisdiction over the claims of foreign

---

[10]    We note that, in cases decided before Morrison, the Second Circuit had expressly rejected the argument that, although the actual manipulation and falsification of the numbers occurred in the United States, "the inaccurate monthly account statements [were] prepared and mailed to investors by the Fund administrator in Bermuda, [and they] constitute[d] the heart of the fraud." Berger, 322 F.3d at 193; see also id. at 193-95. Accord Itoba Ltd. v. LEP Group PLC, 54 F.3d 118, 124 (2d Cir. 1995) ("[W]e hold that the situs of preparations for SEC filings should not be determinative of jurisdictional questions. Otherwise, the protection afforded by the Securities Exchange Act could be circumvented simply by preparing SEC filings outside the United States.").

[11]    As noted above, see supra note 8, this case has been litigated by agreement of the parties pursuant to the Second Circuit's articulation of the conduct test. Because we conclude that the Second Circuit's articulation of the test has been met in this case, we need not decide if the less stringent formulation of the test (as utilized in the Third, Eighth and Ninth Circuits) would also suffice to establish subject matter jurisdiction. Moreover, the recent Morrison case in the Second Circuit may represent a somewhat more stringent application of the conduct test than was indicated in previous Second Circuit cases. Again, because we conclude that the facts in the instant case also satisfy the Morrison application of the Second Circuit test, we need not (and do not) decide whether we should adopt the Morrison application of the test. In other words, we need not decide whether to adopt the Morrison decision's emphasis on the location of the activities performed in ensuring the accuracy of financial information to be provided to the public, and that decision's consequent discounting of the significance of the location of the actual falsification of the relevant numbers. Because the facts alleged in the instant case satisfy even the very stringent application of the conduct test articulated in Morrison, we need not decide whether the Morrison opinion itself correctly denied subject matter jurisdiction notwithstanding the fact that the false numbers at issue there were actually created in Florida.

18

purchasers.[12]

B. The Merits: Germain's Objections

Having established that the district court properly exercised subject matter jurisdiction, we turn to the merits.[13]  First, we will address the adequacy of notice to the class.  Then, we will turn to the adequacy of the settlement itself.

1. Notice

Federal Rule of Civil Procedure 23(e)(1)(B) requires the court to provide "direct notice in a reasonable manner to all class members who would be bound by the [proposed settlement]."  Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford

_____

[12]    With respect to Germain himself, the district court's exercise of subject matter jurisdiction is bolstered by the fact that he purchased his securities on the NYSE.  Although Germain may not have standing to object on behalf of foreigners who purchased on the TSX, we nevertheless address that issue because of our obligation to examine our jurisdiction sua sponte. We note however that the record suggests that there are not many of such foreigners.

[13]    Germain also argues that we should abstain from exercising jurisdiction as a matter of comity.  We review a district court's decision to deny abstention based on international comity for abuse of discretion.  Belize Telecom, Ltd. v. Gov't of Belize, 528 F.3d 1298, 1303 (11th Cir. 2008).  This Court weighs three factors in determining whether to abstain: "(1) international comity; (2) fairness to litigants; and (3) efficient use of scarce judicial resources." Belize, 528 F.3d at 1305.
    First, with respect to principles of comity, we note that "courts regularly permit parallel proceedings in an American court and a foreign court."  Turner Entm't v. Degeto Film, 25 F.3d 1512, 1521 (11th Cir. 1994).  Second, as discussed below, the settlement is fair, reasonable and adequate.  Finally, the American courts have invested substantial judicial resources in this lawsuit, and the resources invested by the Canadian courts will be unaffected with respect to opt-outs and Canadian citizens who purchased on the TSX.  Accordingly, we conclude that the district court did not abuse its discretion.

19

them an opportunity to present their objections." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S. Ct. 652, 657 (1950). Germain argues, in essence, that notice did not reasonably apprise class members of their rights with respect to the Canadian Actions. This argument is without merit. The Supplemental Notice expressly informs class members of the Canadian Actions, provides contact information for further inquiries, and states that failure to opt out of the present settlement might preclude participation in the Canadian Actions.

2. The Settlement

The district court reviews a class action settlement to determine whether it is fair, reasonable and adequate. See Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984). The court considers these relevant factors:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved

Id. at 986. Germain alleges essentially that the district court erred in approving the settlement because foreign class members have potential for a greater recovery in the Canadian Actions. Germain makes no attempt to argue that the settlement is unfair for reasons outside the existence of the Canadian Actions. Thus, our

20

consideration is limited to this single factor. We observe that notice adequately informed class members of the pending Canadian Actions. They were provided with the necessary information to pursue further inquiries. Any class member wishing to pursue the Canadian Actions could opt out of the instant settlement. Recovery in the Canadian action remains speculative, and, finally, there is no allegation that the instant recovery is otherwise unfair. Accordingly, we discern no abuse of discretion in the district court's approval of the settlement. Cf. In re Corrugated Container Antitrust Litig., 643 F.2d 195, 222 (11th Cir. 1981) ("We agree with the district court that releases from state claims are generally reasonable and the objectors have not pointed to any extraordinary factors dictating different treatment of the state-claim releases here.").

## CONCLUSION

For the foregoing reasons, we conclude that the district court properly exercised subject matter jurisdiction over the claims of foreign purchasers. On the merits, Germain's objections are easily dismissed.[14] Accordingly, the decision of the district court is

AFFIRMED.

---

[14] All arguments not explicitly addressed are rejected without need for further discussion.