(Slip Opinion)      OCTOBER TERM, 2009      1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MORRISON ET AL. *v.* NATIONAL AUSTRALIA BANK LTD. ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 08–1191.   Argued March 29, 2010—Decided June 24, 2010

In 1998, respondent National Australia Bank (National), a foreign bank whose "ordinary shares" are not traded on any exchange in this country, purchased respondent HomeSide Lending, a company headquartered in Florida that was in the business of servicing mortgages— seeing to collection of the monthly payments, etc.  In 2001, National had to write down the value of HomeSide's assets, causing National's share prices to fall.   Petitioners, Australians who purchased National's shares before the write-downs, sued respondents—National, HomeSide, and officers of both companies—in Federal District Court for violation of §§10(b) and 20(a) of the Securities and Exchange Act of 1934 and SEC Rule 10b–5.  They claimed that HomeSide and its officers had manipulated financial models to make the company's mortgage-servicing rights appear more valuable than they really were; and that National and its chief executive officer were aware of this deception.  Respondents moved to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6).  The District Court granted the former motion, finding no jurisdiction because the domestic acts were, at most, a link in a securities fraud that concluded abroad.  The Second Circuit affirmed.

Held:

   1. The Second Circuit erred in considering §10(b)'s extraterritorial reach to raise a question of subject-matter jurisdiction, thus allowing dismissal under Rule 12(b)(1).  What conduct §10(b) reaches is a merits question, while subject-matter jurisdiction "refers to a tribunal's power to hear a case."  *Union Pacific R. Co.* v. *Brotherhood of Locomotive Engineers and Trainmen Gen. Comm. of Adjustment, Central*

*Region*, 558 U. S. ___, ___ (internal quotation marks omitted).  The District Court had jurisdiction under 15 U. S. C. §78aa to adjudicate the §10(b) question.  However, it is unnecessary to remand in view of that error because the same analysis justifies dismissal under Rule 12(b)(6).  Pp. 4–5.

2. Section 10(b) does not provide a cause of action to foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities traded on foreign exchanges.  Pp. 5–24.

(a) It is a "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.' " *EEOC* v. *Arabian American Oil Co.*, 499 U. S. 244, 248 *(Aramco).*  When a statute gives no clear indication of an extraterritorial application, it has none.  Nonetheless, the Second Circuit believed the Exchange Act's silence about §10(b)'s extraterritorial application permitted the court to "discern" whether Congress would have wanted the statute to apply.  This disregard of the presumption against extraterritoriality has occurred over many decades in many courts of appeals and has produced a collection of tests for divining congressional intent that are complex in formulation and unpredictable in application.  The results demonstrate the wisdom of the presumption against extraterritoriality.  Rather than guess anew in each case, this Court applies the presumption in all cases, preserving a stable background against which Congress can legislate with predictable effects.  Pp. 5–12.

(b) Because Rule 10b–5 was promulgated under §10(b), it "does not extend beyond conduct encompassed by §10(b)'s prohibition." *United States* v. *O'Hagan*, 521 U. S. 642, 651.  Thus, if §10(b) is not extraterritorial, neither is Rule 10b–5.  On its face, §10(b) contains nothing to suggest that it applies abroad.  Contrary to the argument of petitioners and the Solicitor General, a general reference to foreign commerce in the definition of "interstate commerce," see 15 U. S. C. §78c(a)(17), does not defeat the presumption against extraterritoriality, *Aramco, supra,* at 251.  Nor does a fleeting reference, in §78b(2)'s description of the Exchange Act's purposes, to the dissemination and quotation abroad of prices of domestically traded securities.  Nor does Exchange Act §30(b), which says that the Act does not apply "to any person insofar as he transacts a business in securities without the jurisdiction of the United States," unless he does so in violation of regulations promulgated by the SEC "to prevent . . . evasion of [the Act]."  This would be an odd way of indicating that the Act always has extraterritorial application; the Commission's enabling regulations preventing "evasion" seem directed at actions abroad that might conceal a domestic violation.  The argument of petitioners and the Solicitor

General also fails to account for §30(a), which explicitly provides for a specific extraterritorial application. That provision would be quite superfluous if the rest of the Exchange Act already applied to transactions on foreign exchanges—and its limitation of that application to securities of domestic issuers would be inoperative. There being no affirmative indication in the Exchange Act that §10(b) applies extraterritorially, it does not. Pp. 12–16.

(c) The domestic activity in this case—Florida is where Home-Side and its executives engaged in the alleged deceptive conduct and where some misleading public statements were made—does not mean petitioners only seek domestic application of the Act. It is a rare case of prohibited extraterritorial application that lacks *all* contact with United States territory. In *Aramco*, for example, where the plaintiff had been hired in Houston and was an American citizen, see 499 U. S., at 247, this Court concluded that the "focus" of congressional concern in Title VII of the Civil Rights Act of 1964 was neither that territorial event nor that relationship, but domestic employment. Applying that analysis here: The Exchange Act's focus is not on the place where the deception originated, but on purchases and sales of securities in the United States. Section 10(b) applies only to transactions in securities listed on domestic exchanges and domestic transactions in other securities. The primacy of the domestic exchange is suggested by the Exchange Act's prologue, see 48 Stat. 881, and by the fact that the Act's registration requirements apply only to securities listed on national securities exchanges, §78*l*(a). This focus is also strongly confirmed by §30(a) and (b). Moreover, the Court rejects the notion that the Exchange Act reaches conduct in this country affecting exchanges or transactions abroad for the same reason that *Aramco* rejected overseas application of Title VII: The probability of incompatibility with other countries' laws is so obvious that if Congress intended such foreign application "it would have addressed the subject of conflicts with foreign laws and procedures." 499 U. S., at 256. Neither the Government nor petitioners provide any textual support for their proposed alternative test, which would find a violation where the fraud involves significant and material conduct in the United States. Pp. 17–24.

547 F. 3d 167, affirmed.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, and ALITO, JJ., joined. BREYER, J., filed an opinion concurring in part and concurring in the judgment. STEVENS, J., filed an opinion concurring in the judgment, in which GINSBURG, J., joined. SOTOMAYOR, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–1191

_____

## ROBERT MORRISON, ET AL., PETITIONERS *v.* NATIONAL AUSTRALIA BANK LTD. ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 24, 2010]

JUSTICE SCALIA delivered the opinion of the Court.

We decide whether §10(b) of the Securities Exchange Act of 1934 provides a cause of action to foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities traded on foreign exchanges.

I

Respondent National Australia Bank Limited (National) was, during the relevant time, the largest bank in Australia. Its Ordinary Shares—what in America would be called "common stock"—are traded on the Australian Stock Exchange Limited and on other foreign securities exchanges, but not on any exchange in the United States. There are listed on the New York Stock Exchange, however, National's American Depositary Receipts (ADRs), which represent the right to receive a specified number of National's Ordinary Shares. 547 F. 3d 167, 168, and n. 1 (CA2 2008).

The complaint alleges the following facts, which we accept as true. In February 1998, National bought respondent HomeSide Lending, Inc., a mortgage servicing

company headquartered in Florida. HomeSide's business was to receive fees for servicing mortgages (essentially the administrative tasks associated with collecting mortgage payments, see J. Rosenberg, Dictionary of Banking and Financial Services 600 (2d ed. 1985)). The rights to receive those fees, so-called mortgage-servicing rights, can provide a valuable income stream. See 2 The New Palgrave Dictionary of Money and Finance 817 (P. Newman, M. Milgate, & J. Eatwell eds. 1992). How valuable each of the rights is depends, in part, on the likelihood that the mortgage to which it applies will be fully repaid before it is due, terminating the need for servicing. HomeSide calculated the present value of its mortgage-servicing rights by using valuation models designed to take this likelihood into account. It recorded the value of its assets, and the numbers appeared in National's financial statements.

From 1998 until 2001, National's annual reports and other public documents touted the success of HomeSide's business, and respondents Frank Cicutto (National's managing director and chief executive officer), Kevin Race (HomeSide's chief operating officer), and Hugh Harris (HomeSide's chief executive officer) did the same in public statements. But on July 5, 2001, National announced that it was writing down the value of HomeSide's assets by $450 million; and then again on September 3, by another $1.75 billion. The prices of both Ordinary Shares and ADRs slumped. After downplaying the July write-down, National explained the September write-down as the result of a failure to anticipate the lowering of prevailing interest rates (lower interest rates lead to more refinancings, *i.e.*, more early repayments of mortgages), other mistaken assumptions in the financial models, and the loss of goodwill. According to the complaint, however, HomeSide, Race, Harris, and another HomeSide senior executive who is also a respondent here had manipulated HomeSide's financial models to make the rates of early

repayment unrealistically low in order to cause the mortgage-servicing rights to appear more valuable than they really were.  The complaint also alleges that National and Cicutto were aware of this deception by July 2000, but did nothing about it.

As relevant here, petitioners Russell Leslie Owen and Brian and Geraldine Silverlock, all Australians, purchased National's Ordinary Shares in 2000 and 2001, before the write-downs.[1]  They sued National, HomeSide, Cicutto, and the three HomeSide executives in the United States District Court for the Southern District of New York for alleged violations of §§10(b) and 20(a) of the Securities and Exchange Act of 1934, 48 Stat. 891, 15 U. S. C. §§78j(b) and 78t(a), and SEC Rule 10b–5, 17 CFR §240.10b–5 (2009), promulgated pursuant to §10(b).[2]  They sought to represent a class of foreign purchasers of National's Ordinary Shares during a specified period up to the September write-down.  547 F. 3d, at 169.

––––––––––

[1] Robert Morrison, an American investor in National's ADRs, also brought suit, but his claims were dismissed by the District Court because he failed to allege damages. *In re National Australia Bank Securities Litigation*, No. 03 Civ. 6537 (BSJ), 2006 WL 3844465, \*9 (SDNY, Oct. 25, 2006).  Petitioners did not appeal that decision, 547 F. 3d 167, 170, n. 3 (CA2 2008) (case below), and it is not before us. Inexplicably, Morrison continued to be listed as a petitioner in the Court of Appeals and here.

[2] The relevant text of §10(b) and SEC Rule 10b–5 are set forth later in this opinion.  Section 20(a), 48 Stat. 899, provides:

"Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

Liability under §20(a) is obviously derivative of liability under some other provision of the Exchange Act; §10(b) is the only basis petitioners asserted.

Respondents moved to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). The District Court granted the motion on the former ground, finding no jurisdiction because the acts in this country were, "at most, a link in the chain of an alleged overall securities fraud scheme that culminated abroad." *In re National Australia Bank Securities Litigation*, No. 03 Civ. 6537 (BSJ), 2006 WL 3844465, *8 (SDNY, Oct. 25, 2006). The Court of Appeals for the Second Circuit affirmed on similar grounds. The acts performed in the United States did not "compris[e] the heart of the alleged fraud." 547 F. 3d, at 175–176. We granted certiorari, 558 U. S. ___ (2009).

## II

Before addressing the question presented, we must correct a threshold error in the Second Circuit's analysis. It considered the extraterritorial reach of §10(b) to raise a question of subject-matter jurisdiction, wherefore it affirmed the District Court's dismissal under Rule 12(b)(1). See 547 F. 3d, at 177. In this regard it was following Circuit precedent, see *Schoenbaum* v. *Firstbrook*, 405 F. 2d 200, 208, modified on other grounds en banc, 405 F. 2d 215 (1968). The Second Circuit is hardly alone in taking this position, see, *e.g., In re CP Ships Ltd. Securities Litigation*, 578 F. 3d 1306, 1313 (CA11 2009); *Continental Grain (Australia) PTY. Ltd.* v. *Pacific Oilseeds, Inc.*, 592 F. 2d 409, 421 (CA8 1979).

But to ask what conduct §10(b) reaches is to ask what conduct §10(b) prohibits, which is a merits question. Subject-matter jurisdiction, by contrast, "refers to a tribunal's '"power to hear a case."'" *Union Pacific R. Co.* v. *Locomotive Engineers and Trainmen Gen. Comm. of Adjustment, Central Region*, 558 U. S. ___, ___ (2009) (slip op., at 12) (quoting *Arbaugh* v. *Y & H Corp.*, 546 U. S. 500,

514 (2006), in turn quoting *United States* v. *Cotton*, 535 U. S. 625, 630 (2002)). It presents an issue quite separate from the question whether the allegations the plaintiff makes entitle him to relief. See *Bell* v. *Hood*, 327 U. S. 678, 682 (1946). The District Court here had jurisdiction under 15 U. S. C. §78aa[3] to adjudicate the question whether §10(b) applies to National's conduct.

In view of this error, which the parties do not dispute, petitioners ask us to remand. We think that unnecessary. Since nothing in the analysis of the courts below turned on the mistake, a remand would only require a new Rule 12(b)(6) label for the same Rule 12(b)(1) conclusion. As we have done before in situations like this, see, *e.g., Romero* v. *International Terminal Operating Co.*, 358 U. S. 354, 359, 381–384 (1959), we proceed to address whether petitioners' allegations state a claim.

## III

### A

It is a "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *EEOC* v. *Arabian American Oil Co.*, 499 U. S. 244, 248 (1991) *(Aramco)* (quoting *Foley Bros., Inc.* v. *Filardo*, 336 U. S. 281, 285 (1949)). This principle represents a canon of construction, or a presumption about a statute's meaning, rather than a limit upon Congress's power to legislate, see *Blackmer* v. *United States*, 284 U. S. 421, 437 (1932). It rests on the perception that Congress ordinarily legislates with respect to domestic,

—————————

[3] Section 78aa provides:

"The district courts of the United States . . . shall have exclusive jurisdiction of violations of [the Exchange Act] or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by [the Exchange Act] or the rules and regulations thereunder."

not foreign matters. *Smith* v. *United States*, 507 U. S. 197, 204, n. 5 (1993). Thus, "unless there is the affirmative intention of the Congress clearly expressed" to give a statute extraterritorial effect, "we must presume it is primarily concerned with domestic conditions." *Aramco*, *supra*, at 248 (internal quotation marks omitted). The canon or presumption applies regardless of whether there is a risk of conflict between the American statute and a foreign law, see *Sale* v. *Haitian Centers Council, Inc.*, 509 U. S. 155, 173–174 (1993). When a statute gives no clear indication of an extraterritorial application, it has none.

Despite this principle of interpretation, long and often recited in our opinions, the Second Circuit believed that, because the Exchange Act is silent as to the extraterritorial application of §10(b), it was left to the court to "discern" whether Congress would have wanted the statute to apply. See 547 F. 3d, at 170 (internal quotation marks omitted). This disregard of the presumption against extraterritoriality did not originate with the Court of Appeals panel in this case. It has been repeated over many decades by various courts of appeals in determining the application of the Exchange Act, and §10(b) in particular, to fraudulent schemes that involve conduct and effects abroad. That has produced a collection of tests for divining what Congress would have wanted, complex in formulation and unpredictable in application.

As of 1967, district courts at least in the Southern District of New York had consistently concluded that, by reason of the presumption against extraterritoriality, §10(b) did not apply when the stock transactions underlying the violation occurred abroad. See *Schoenbaum* v. *Firstbrook*, 268 F. Supp. 385, 392 (1967) (citing *Ferraoli* v. *Cantor*, CCH Fed. Sec. L. Rep. ¶91615 (SDNY 1965) and *Kook* v. *Crang*, 182 F. Supp. 388, 390 (SDNY 1960)). *Schoenbaum* involved the sale in Canada of the treasury shares of a Canadian corporation whose publicly traded

shares (but not, of course, its treasury shares) were listed on both the American Stock Exchange and the Toronto Stock Exchange. Invoking the presumption against extraterritoriality, the court held that §10(b) was inapplicable (though it incorrectly viewed the defect as jurisdictional). 268 F. Supp., at 391–392, 393–394. The decision in *Schoenbaum* was reversed, however, by a Second Circuit opinion which held that "neither the usual presumption against extraterritorial application of legislation nor the specific language of [§]30(b) show Congressional intent to preclude application of the Exchange Act to transactions regarding stocks traded in the United States which are effected outside the United States . . . ." *Schoenbaum*, 405 F. 2d, at 206. It sufficed to apply §10(b) that, although the transactions in treasury shares took place in Canada, they affected the value of the common shares publicly traded in the United States. See *id.,* at 208–209. Application of §10(b), the Second Circuit found, was "necessary to protect American investors," *id.,* at 206.

The Second Circuit took another step with *Leasco Data Processing Equip. Corp.* v. *Maxwell*, 468 F. 2d 1326 (1972), which involved an American company that had been fraudulently induced to buy securities in England. There, unlike in *Schoenbaum*, some of the deceptive conduct had occurred in the United States but the corporation whose securities were traded (abroad) was not listed on any domestic exchange. *Leasco* said that the presumption against extraterritoriality apples only to matters over which the United States would not have prescriptive jurisdiction, 468 F. 2d, at 1334. Congress had prescriptive jurisdiction to regulate the deceptive conduct in this country, the language of the Act could be read to cover that conduct, and the court concluded that "if Congress had thought about the point," it would have wanted §10(b) to apply. *Id.,* at 1334–1337.

With *Schoenbaum* and *Leasco* on the books, the Second

Circuit had excised the presumption against extraterritoriality from the jurisprudence of §10(b) and replaced it with the inquiry whether it would be reasonable (and hence what Congress would have wanted) to apply the statute to a given situation.  As long as there was prescriptive jurisdiction to regulate, the Second Circuit explained, whether to apply §10(b) even to "predominantly foreign" transactions became a matter of whether a court thought Congress "wished the precious resources of United States courts and law enforcement agencies to be devoted to them rather than leave the problem to foreign countries." *Bersch* v. *Drexel Firestone, Inc.*, 519 F. 2d 974, 985 (1975); see also *IIT* v. *Vencap, Ltd.*, 519 F. 2d 1001, 1017–1018 (CA2 1975).

The Second Circuit had thus established that application of §10(b) could be premised upon either some effect on American securities markets or investors *(Schoenbaum)* or significant conduct in the United States *(Leasco).*  It later formalized these two applications into (1) an "effects test," "whether the wrongful conduct had a substantial effect in the United States or upon United States citizens," and (2) a "conduct test," "whether the wrongful conduct occurred in the United States." *SEC* v. *Berger*, 322 F. 3d 187, 192–193 (CA2 2003).  These became the north star of the Second Circuit's §10(b) jurisprudence, pointing the way to what Congress would have wished.  Indeed, the Second Circuit declined to keep its two tests distinct on the ground that "an admixture or combination of the two often gives a better picture of whether there is sufficient United States involvement to justify the exercise of jurisdiction by an American court." *Itoba Ltd.* v. *Lep Group PLC*, 54 F. 3d 118, 122 (1995).  The Second Circuit never put forward a textual or even extratextual basis for these tests.  As early as *Bersch*, it confessed that "if we were asked to point to language in the statutes, or even in the legislative history, that compelled these conclusions, we would be

unable to respond," 519 F. 2d, at 993.

As they developed, these tests were not easy to administer. The conduct test was held to apply differently depending on whether the harmed investors were Americans or foreigners: When the alleged damages consisted of losses to American investors abroad, it was enough that acts "of material importance" performed in the United States "significantly contributed" to that result; whereas those acts must have "directly caused" the result when losses to foreigners abroad were at issue. See *Bersch*, 519 F. 2d, at 993. And "merely preparatory activities in the United States" did not suffice "to trigger application of the securities laws for injury to foreigners located abroad." *Id.,* at 992. This required the court to distinguish between mere preparation and using the United States as a "base" for fraudulent activities in other countries. *Vencap*, *supra*, at 1017–1018. But merely satisfying the conduct test was sometimes insufficient without "'some additional factor tipping the scales'" in favor of the application of American law. *Interbrew* v. *Edperbrascan Corp.*, 23 F. Supp. 2d 425, 432 (SDNY 1998) (quoting *Europe & Overseas Commodity Traders, S. A.* v. *Banque Paribas London*, 147 F. 3d 118, 129 (CA2 1998)). District courts have noted the difficulty of applying such vague formulations. See, *e.g., In re Alstom SA*, 406 F. Supp. 2d 346, 366–385 (SDNY 2005). There is no more damning indictment of the "conduct" and "effects" tests than the Second Circuit's own declaration that "the presence or absence of any single factor which was considered significant in other cases . . . is not necessarily dispositive in future cases." *IIT* v. *Cornfeld*, 619 F. 2d 909, 918 (1980) (internal quotation marks omitted).

Other Circuits embraced the Second Circuit's approach, though not its precise application. Like the Second Circuit, they described their decisions regarding the extraterritorial application of §10(b) as essentially resolving matters of policy. See, *e.g., SEC* v. *Kasser*, 548 F. 2d 109, 116

(CA3 1977); *Continental Grain*, 592 F. 2d, at 421–422; *Grunenthal GmbH* v. *Hotz*, 712 F. 2d 421, 424–425 (CA9 1983); *Kauthar SDN BHD* v. *Sternberg*, 149 F. 3d 659, 667 (CA7 1998). While applying the same fundamental methodology of balancing interests and arriving at what seemed the best policy, they produced a proliferation of vaguely related variations on the "conduct" and "effects" tests. As described in a leading Seventh Circuit opinion: "Although the circuits . . . seem to agree that there are some transnational situations to which the antifraud provisions of the securities laws are applicable, agreement appears to end at that point."[4] *Id.,* at 665. See also *id.,* at 665–667 (describing the approaches of the various Circuits and adopting yet another variation).

At least one Court of Appeals has criticized this line of cases and the interpretive assumption that underlies it. In *Zoelsch* v. *Arthur Andersen & Co.*, 824 F. 2d 27, 32 (1987) (Bork, J.), the District of Columbia Circuit observed that rather than courts' "divining what 'Congress would have wished' if it had addressed the problem[, a] more natural inquiry might be what jurisdiction Congress in

_____

[4] The principal concurrence (see *post,* p. 1 (STEVENS, J., concurring in judgment) (hereinafter concurrence)) disputes this characterization, launching into a Homeric simile which takes as its point of departure (and mistakes for praise rather than condemnation) then-Justice Rehnquist's statement in *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 737 (1975) that "[w]hen we deal with private actions under Rule 10b–5, we deal with a judicial oak which has grown from little more than a legislative acorn." *Post*, at 3. The concurrence seemingly believes that the Courts of Appeals have carefully trimmed and sculpted this "judicial oak" into a cohesive canopy, under the watchful eye of Judge Henry Friendly, the "master arborist," *ibid.* See *post,* at 2–3. Even if one thinks that the "conduct" and "effects" tests are numbered among Judge Friendly's many fine contributions to the law, his successors, though perhaps under the impression that they nurture the same mighty oak, are in reality tending each its own botanically distinct tree. It is telling that the concurrence never attempts its own synthesis of the various balancing tests the Circuits have adopted.

fact thought about and conferred." Although tempted to apply the presumption against extraterritoriality and be done with it, see *id.,* at 31–32, that court deferred to the Second Circuit because of its "preeminence in the field of securities law," *id.,* at 32. See also *Robinson* v. *TCI/US West Communications Inc.*, 117 F. 3d 900, 906–907 (CA5 1997) (expressing agreement with *Zoelsch*'s criticism of the emphasis on policy considerations in some of the cases).

Commentators have criticized the unpredictable and inconsistent application of §10(b) to transnational cases. See, *e.g.,* Choi & Silberman, Transnational Litigation and Global Securities Class-Action Lawsuits, 2009 Wis. L. Rev. 465, 467–468; Chang, Multinational Enforcement of U. S. Securities Laws: The Need for the Clear and Restrained Scope of Extraterritorial Subject-Matter Jurisdiction, 9 Fordham J. Corp. & Fin. L. 89, 106–108, 115–116 (2004); Langevoort, *Schoenbaum* Revisited: Limiting the Scope of Antifraud Protection in an Internationalized Securities Marketplace, 55 Law & Contemp. Probs. 241, 244–248 (1992). Some have challenged the premise underlying the Courts of Appeals' approach, namely that Congress did not consider the extraterritorial application of §10(b) (thereby leaving it open to the courts, supposedly, to determine what Congress would have wanted). See, *e.g.,* Sachs, The International Reach of Rule 10b–5: The Myth of Congressional Silence, 28 Colum. J. Transnat'l L. 677 (1990) (arguing that Congress considered, but rejected, applying the Exchange Act to transactions abroad). Others, more fundamentally, have noted that using congressional silence as a justification for judge-made rules violates the traditional principle that silence means no extraterritorial application. See, *e.g.,* Note, Let There Be Fraud (Abroad): A Proposal for A New U. S. Jurisprudence with Regard to the Extraterritorial Application of the Anti-Fraud Provisions of the 1933 and 1934 Securities Acts, 28 Law & Pol'y

Int'l Bus. 477, 492–493 (1997).

The criticisms seem to us justified. The results of judicial-speculation-made-law—divining what Congress would have wanted if it had thought of the situation before the court—demonstrate the wisdom of the presumption against extraterritoriality. Rather than guess anew in each case, we apply the presumption in all cases, preserving a stable background against which Congress can legislate with predictable effects.[5]

## B

Rule 10b–5, the regulation under which petitioners have brought suit,[6] was promulgated under §10(b), and "does

——————

[5]The concurrence urges us to cast aside our inhibitions and join in the judicial lawmaking, because "[t]his entire area of law is replete with judge-made rules," *post*, at 3. It is doubtless true that, because the implied private cause of action under §10(b) and Rule 10b–5 is a thing of our own creation, we have also defined its contours. See, *e.g.*, *Blue Chip Stamps*, *supra*. But when it comes to "the scope of [the] conduct prohibited by [Rule 10b–5 and] §10(b), the text of the statute controls our decision." *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 173 (1994). It is only with respect to the additional "elements of the 10b–5 private liability scheme" that we "have had 'to infer how the 1934 Congress would have addressed the issue[s] had the 10b–5 action been included as an express provision in the 1934 Act.'" *Ibid.* (quoting *Musick, Peeler & Garrett* v. *Employers Ins. of Wausau*, 508 U. S. 286, 294 (1933)).

[6]Rule 10b–5 makes it unlawful:

"for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

    "(a) To employ any device, scheme, or artifice to defraud,

    "(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    "(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."    17 CFR §240.10b–5 (2009).

not extend beyond conduct encompassed by §10(b)'s prohibition." *United States* v. *O'Hagan*, 521 U. S. 642, 651 (1997). Therefore, if §10(b) is not extraterritorial, neither is Rule 10b–5.

On its face, §10(b) contains nothing to suggest it applies abroad:

> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe . . . ." 15 U. S. C. 78j(b).

Petitioners and the Solicitor General contend, however, that three things indicate that §10(b) or the Exchange Act in general has at least some extraterritorial application.

First, they point to the definition of "interstate commerce," a term used in §10(b), which includes "trade, commerce, transportation, or communication . . . between any foreign country and any State." 15 U. S. C. §78c(a)(17). But "we have repeatedly held that even statutes that contain broad language in their definitions of 'commerce' that expressly refer to '*foreign* commerce' do not apply abroad." *Aramco*, 499 U. S., at 251; see *id.,* at 251–252 (discussing cases). The general reference to foreign commerce in the definition of "interstate commerce" does not defeat the presumption against extraterri-

---

The Second Circuit considered petitioners' appeal to raise only a claim under Rule 10b–5(b), since it found their claims under subsections (a) and (c) to be forfeited. 547 F. 3d, at 176, n. 7. We do likewise.

toriality.[7]

Petitioners and the Solicitor General next point out that Congress, in describing the purposes of the Exchange Act, observed that the "prices established and offered in such transactions are generally disseminated and quoted throughout the United States and foreign countries." 15 U. S. C. §78b(2). The antecedent of "such transactions," however, is found in the first sentence of the section, which declares that "transactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are affected with a national public interest." §78b. Nothing suggests that this *national* public interest pertains to transactions conducted upon *foreign* exchanges and markets. The fleeting reference to the dissemination and quotation abroad of the prices of securities traded in domestic exchanges and markets cannot overcome the presumption against extraterritoriality.

Finally, there is §30(b) of the Exchange Act, 15 U. S. C. §78dd(b), which *does* mention the Act's extraterritorial application: "The provisions of [the Exchange Act] or of any rule or regulation thereunder shall not apply to any person insofar as he transacts a business in securities without the jurisdiction of the United States," unless he does so in violation of regulations promulgated by the Securities and Exchange Commission "to prevent . . . evasion of [the Act]." (The parties have pointed us to no regulation promulgated pursuant to §30(b).) The Solicitor General argues that "[this] exemption would have no

_____

[7] This conclusion does not render meaningless the inclusion of "trade, commerce, transportation, or communication . . . between any foreign country and any State" in the definition of "interstate commerce." 15 U. S. C. §78c(a)(17). For example, an issuer based abroad, whose executives approve the publication in the United States of misleading information affecting the price of the issuer's securities traded on the New York Stock Exchange, probably will make use of some instrumentality of "communication . . . between [a] foreign country and [a] State."

function if the Act did not apply in the first instance to securities transactions that occur abroad." Brief for United States as *Amicus Curiae* 14.

We are not convinced. In the first place, it would be odd for Congress to indicate the extraterritorial application of the whole Exchange Act by means of a provision imposing a condition precedent to its application abroad. And if the whole Act applied abroad, why would the Commission's enabling regulations be limited to those preventing "evasion" of the Act, rather than all those preventing "violation"? The provision seems to us directed at actions abroad that might conceal a domestic violation, or might cause what would otherwise be a domestic violation to escape on a technicality. At most, the Solicitor General's proposed inference is possible; but possible interpretations of statutory language do not override the presumption against extraterritoriality. See *Aramco*, *supra*, at 253.

The Solicitor General also fails to account for §30(a), which reads in relevant part as follows:

"It shall be unlawful for any broker or dealer . . . to make use of the mails or of any means or instrumentality of interstate commerce for the purpose of effecting on an exchange not within or subject to the jurisdiction of the United States, any transaction in any security the issuer of which is a resident of, or is organized under the laws of, or has its principal place of business in, a place within or subject to the jurisdiction of the United States, in contravention of such rules and regulations as the Commission may prescribe . . . ." 15 U. S. C. §78dd(a).

Subsection 30(a) contains what §10(b) lacks: a clear statement of extraterritorial effect. Its explicit provision for a specific extraterritorial application would be quite superfluous if the rest of the Exchange Act already applied to transactions on foreign exchanges—and its limitation of

that application to securities of domestic issuers would be inoperative. Even if that were not true, when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms. See *Microsoft Corp.* v. *AT&T Corp.*, 550 U. S. 437, 455–456 (2007). No one claims that §30(a) applies here.

The concurrence claims we have impermissibly narrowed the inquiry in evaluating whether a statute applies abroad, citing for that point the dissent in *Aramco*, see *post*, at 6. But we do not say, as the concurrence seems to think, that the presumption against extraterritoriality is a "clear statement rule," *ibid.,* if by that is meant a requirement that a statute say "this law applies abroad." Assuredly context can be consulted as well. But whatever sources of statutory meaning one consults to give "the most faithful reading" of the text, *post*, at 7, there is no clear indication of extraterritoriality here. The concurrence does not even try to refute that conclusion, but merely puts forward the same (at best) uncertain indications relied upon by petitioners and the Solicitor General. As the opinion *for the Court* in *Aramco* (which we prefer to the dissent) shows, those uncertain indications do not suffice.[8]

In short, there is no affirmative indication in the Exchange Act that §10(b) applies extraterritorially, and we therefore conclude that it does not.

---

[8] The concurrence notes that, post-*Aramco*, Congress provided explicitly for extraterritorial application of Title VII, the statute at issue in *Aramco*. *Post*, at 6, n. 6. All this shows is that Congress knows how to give a statute explicit extraterritorial effect—and how to limit that effect to particular applications, which is what the cited amendment did. See Civil Rights Act of 1991, §109, 105 Stat. 1077.

## IV

## A

Petitioners argue that the conclusion that §10(b) does not apply extraterritorially does not resolve this case. They contend that they seek no more than domestic application anyway, since Florida is where HomeSide and its senior executives engaged in the deceptive conduct of manipulating HomeSide's financial models; their complaint also alleged that Race and Hughes made misleading public statements there. This is less an answer to the presumption against extraterritorial application than it is an assertion—a quite valid assertion—that that presumption here (as often) is not self-evidently dispositive, but its application requires further analysis. For it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case. The concurrence seems to imagine just such a timid sentinel, see *post*, at 7–8, but our cases are to the contrary. In *Aramco*, for example, the Title VII plaintiff had been hired in Houston, and was an American citizen. See 499 U. S., at 247. The Court concluded, however, that neither that territorial event nor that relationship was the "focus" of congressional concern, *id.*, at 255, but rather domestic employment. See also *Foley Bros.*, 336 U. S., at 283, 285–286.

Applying the same mode of analysis here, we think that the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States. Section 10(b) does not punish deceptive conduct, but only deceptive conduct "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered." 15 U. S. C. §78j(b). See *SEC* v. *Zandford*,

535 U. S. 813, 820 (2002).  Those purchase-and-sale trans-
actions are the objects of the statute's solicitude.  It is
those transactions that the statute seeks to "regulate," see
*Superintendent of Ins. of N. Y.* v. *Bankers Life & Casualty
Co.*, 404 U. S. 6, 12 (1971); it is parties or prospective
parties to those transactions that the statute seeks to
"protec[t]," *id.*, at 10.    See also *Ernst & Ernst* v.
*Hochfelder*, 425 U. S. 185, 195 (1976).  And it is in our
view only transactions in securities listed on domestic
exchanges, and domestic transactions in other securities,
to which §10(b) applies.[9]

The primacy of the domestic exchange is suggested by
the very prologue of the Exchange Act, which sets forth as
its object "[t]o provide for the regulation of securities
exchanges . . . operating in interstate and foreign com-
merce and through the mails, to prevent inequitable and
unfair practices on such exchanges . . . ."  48 Stat. 881.  We
know of no one who thought that the Act was intended to
"regulat[e]" *foreign* securities exchanges—or indeed who
even believed that under established principles of interna-
tional law Congress had the power to do so.  The Act's
registration requirements apply only to securities listed on
national securities exchanges.  15 U. S. C. §78*l*(a).

─────────

[9]The concurrence seems to think this test has little to do with our
conclusion in Part III, *supra*, that §10(b) does not apply extraterritori-
ally.  See *post*, at 11–12.  That is not so.  If §10(b) did apply abroad, we
would not need to determine which transnational frauds it applied to; it
would apply to all of them (barring some other limitation).  Thus,
although it is true, as we have said, that our threshold conclusion that
§10(b) has no extraterritorial effect does not resolve this case, it is a
necessary first step in the analysis.

The concurrence also makes the curious criticism that our evaluation
of where a putative violation occurs is based on the text of §10(b) rather
than the doctrine in the Courts of Appeals.  *Post*, at 1–2.  Although it
concedes that our test is textually plausible, *post,* at 1, it does not (and
cannot) make the same claim for the Court-of-Appeals doctrine it
endorses.  That is enough to make our test the better one.

With regard to securities *not* registered on domestic exchanges, the exclusive focus on *domestic* purchases and sales[10] is strongly confirmed by §30(a) and (b), discussed earlier. The former extends the normal scope of the Exchange Act's prohibitions to acts effecting, in violation of rules prescribed by the Commission, a "transaction" in a United States security "on an exchange not within or subject to the jurisdiction of the United States." §78dd(a). And the latter specifies that the Act does not apply to "any person insofar as he transacts a business in securities without the jurisdiction of the United States," unless he does so in violation of regulations promulgated by the Commission "to prevent evasion [of the Act]." §78dd(b). Under both provisions it is the foreign location of the *transaction* that establishes (or reflects the presumption of) the Act's inapplicability, absent regulations by the Commission.

The same focus on domestic transactions is evident in the Securities Act of 1933, 48 Stat. 74, enacted by the same Congress as the Exchange Act, and forming part of the same comprehensive regulation of securities trading. See *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 170–171 (1994). That legislation makes it unlawful to sell a security, through a prospectus or otherwise, making use of "any means or instruments of transportation or communication in inter-

───────────

[10] That is in our view the meaning which the presumption against extraterritorial application requires for the words "purchase or sale, of . . . any security not so registered" in §10(b)'s phrase "in connection with the purchase or sale of any security registered on a national securities exchange *or any security not so registered*" (emphasis added). Even without the presumption against extraterritorial application, the only alternative to that reading makes nonsense of the phrase, causing it to cover all purchases and sales of registered securities, and all purchases and sales of nonregistered securities—a thought which, if intended, would surely have been expressed by the simpler phrase "all purchases and sales of securities."

state commerce or of the mails," unless a registration statement is in effect. 15 U. S. C. §77e(a)(1). The Commission has interpreted that requirement "not to include . . . sales that occur outside the United States." 17 CFR §230.901 (2009).

Finally, we reject the notion that the Exchange Act reaches conduct in this country affecting exchanges or transactions abroad for the same reason that *Aramco* rejected overseas application of Title VII to all domestically concluded employment contracts or all employment contracts with American employers: The probability of incompatibility with the applicable laws of other countries is so obvious that if Congress intended such foreign application "it would have addressed the subject of conflicts with foreign laws and procedures." 499 U. S., at 256. Like the United States, foreign countries regulate their domestic securities exchanges and securities transactions occurring within their territorial jurisdiction. And the regulation of other countries often differs from ours as to what constitutes fraud, what disclosures must be made, what damages are recoverable, what discovery is available in litigation, what individual actions may be joined in a single suit, what attorney's fees are recoverable, and many other matters. See, *e.g.,* Brief for United Kingdom of Great Britain and Northern Ireland as *Amicus Curiae* 16–21. The Commonwealth of Australia, the United Kingdom of Great Britain and Northern Ireland, and the Republic of France have filed *amicus* briefs in this case. So have (separately or jointly) such international and foreign organizations as the International Chamber of Commerce, the Swiss Bankers Association, the Federation of German Industries, the French Business Confederation, the Institute of International Bankers, the European Banking Federation, the Australian Bankers' Association, and the Association Française des Entreprises Privées. They all complain of the interference with foreign securities regula-

tion that application of §10(b) abroad would produce, and urge the adoption of a clear test that will avoid that consequence. The transactional test we have adopted—whether the purchase or sale is made in the United States, or involves a security listed on a domestic exchange—meets that requirement.

### B

The Solicitor General suggests a different test, which petitioners also endorse: "[A] transnational securities fraud violates [§]10(b) when the fraud involves significant conduct in the United States that is material to the fraud's success." Brief for United States as *Amicus Curiae* 16; see Brief for Petitioners 26. Neither the Solicitor General nor petitioners provide any textual support for this test. The Solicitor General sets forth a number of purposes such a test would serve: achieving a high standard of business ethics in the securities industry, ensuring honest securities markets and thereby promoting investor confidence, and preventing the United States from becoming a "Barbary Coast" for malefactors perpetrating frauds in foreign markets. Brief for United States as *Amicus Curiae* 16–17. But it provides no textual support for the last of these purposes, or for the first two as applied to the foreign securities industry and securities markets abroad. It is our function to give the statute the effect its language suggests, however modest that may be; not to extend it to admirable purposes it might be used to achieve.

If, moreover, one is to be attracted by the desirable consequences of the "significant and material conduct" test, one should also be repulsed by its adverse consequences. While there is no reason to believe that the United States has become the Barbary Coast for those perpetrating frauds on foreign securities markets, some fear that it has become the Shangri-La of class-action litigation for lawyers representing those allegedly cheated

in foreign securities markets. See Brief for Infineon Technologies AG as *Amicus Curiae* 1–2, 22–25; Brief for European Aeronautic Defence & Space Co. N. V. et al. as *Amici Curiae* 2–4; Brief for Securities Industry and Financial Markets Association et al. as *Amici Curiae* 10–16; Coffee, Securities Policeman to the World? The Cost of Global Class Actions, N. Y. L. J. 5 (2008); S. Grant & D. Zilka, The Current Role of Foreign Investors in Federal Securities Class Actions, PLI Corporate Law and Practice Handbook Series, PLI Order No. 11072, pp. 15–16 (Sept.-Oct. 2007); Buxbaum, Multinational Class Actions Under Federal Securities Law: Managing Jurisdictional Conflict, 46 Colum. J. Transnat'l L. 14, 38–41 (2007).

As case support for the "significant and material conduct" test, the Solicitor General relies primarily on *Pasquantino* v. *United States*, 544 U. S. 349 (2005).[11] In

----

[11] Discussed in Brief for United States as *Amicus Curiae* 22–23. The Solicitor General also cites, without description, a number of antitrust cases to support the proposition that domestic conduct with consequences abroad can be covered even by a statute that does not apply extraterritorially: *Continental Ore Co.* v. *Union Carbide & Carbon Corp.*, 370 U. S. 690 (1962); *United States* v. *Sisal Sales Corp.*, 274 U. S. 268 (1927); *Thomsen* v. *Cayser*, 243 U. S. 66 (1917); *United States* v. *Pacific & Arctic R. & Nav. Co.*, 228 U. S. 87 (1913). These are no longer of relevance to the point (if they ever were), since *Continental Ore* overruled the holding of *American Banana Co.* v. *United Fruit Co.*, 213 U. S. 347, 357 (1909), that the antitrust laws do not apply extraterritorially. See W. S. *Kirkpatrick & Co.* v. *Environmental Tectonics Corp. Int'l,* 493 U. S. 400, 407–408 (1990). Moreover, the pre-*Continental Ore* cases all involved conspiracies to restrain trade in the United States, see *Sisal Sales*, *supra*, at 274–276; *Thomsen*, *supra*, at 88; *Pacific & Arctic*, *supra*, at 105–106. And although a final case cited by the Solicitor General, *Steele* v. *Bulova Watch Co.*, 344 U. S. 280, 287–288 (1952), might be read to permit application of a nonextraterritorial statute whenever conduct in the United States contributes to a violation abroad, we have since read it as interpreting the statute at issue—the Lanham Act—to have extraterritorial effect, *EEOC* v. *Arabian American Oil Co.,* 499 U. S. 244, 252 (1991) (quoting 15 U. S. C. §1127).

that case we concluded that the wire-fraud statute, 18 U. S. C. §1343 (2009 ed., Supp. II), was violated by defendants who ordered liquor over the phone from a store in Maryland with the intent to smuggle it into Canada and deprive the Canadian Government of revenue. 544 U. S., at 353, 371. Section 1343 prohibits "any scheme or artifice to defraud,"—fraud *simpliciter*, without any requirement that it be "in connection with" any particular transaction or event. The *Pasquantino* Court said that the petitioners' "offense was complete the moment they executed the scheme inside the United States," and that it was "[t]his domestic element of petitioners' conduct [that] the Government is punishing." 544 U. S., at 371. Section 10(b), by contrast, punishes not all acts of deception, but only such acts "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered." Not deception alone, but deception with respect to certain purchases or sales is necessary for a violation of the statute.

The Solicitor General points out that the "significant and material conduct" test is in accord with prevailing notions of international comity. If so, that proves that *if* the United States asserted prescriptive jurisdiction pursuant to the "significant and material conduct" test it would not violate customary international law; but it in no way tends to prove that that is what Congress has done.

Finally, the Solicitor General argues that the Commission has adopted an interpretation similar to the "significant and material conduct" test, and that we should defer to that. In the two adjudications the Solicitor General cites, however, the Commission did not purport to be providing its own interpretation of the statute, but relied on decisions of federal courts—mainly Court of Appeals decisions that in turn relied on the *Schoenbaum* and *Leasco* decisions of the Second Circuit that we discussed earlier. See *In re United Securities Clearing Corp.*, 52

S. E. C. 92, 95, n. 14, 96, n. 16 (1994); *In re Robert F. Lynch*, Exchange Act Release No. 11737, 8 S. E. C. Docket 75, 77, n. 15 (1975). We need "accept only those agency interpretations that are reasonable in light of the principles of construction courts normally employ." *Aramco*, 499 U. S., at 260 (SCALIA, J., concurring in part and concurring in judgment). Since the Commission's interpretations relied on cases we disapprove, which ignored or discarded the presumption against extraterritoriality, we owe them no deference.

\* \* \*

Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States. This case involves no securities listed on a domestic exchange, and all aspects of the purchases complained of by those petitioners who still have live claims occurred outside the United States. Petitioners have therefore failed to state a claim on which relief can be granted. We affirm the dismissal of petitioners' complaint on this ground.

*It is so ordered.*

JUSTICE SOTOMAYOR took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

No. 08–1191

ROBERT MORRISON, ET AL., PETITIONERS *v.*
NATIONAL AUSTRALIA BANK
LTD. ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 24, 2010]

JUSTICE BREYER, concurring in part and concurring in the judgment.

Section 10(b) of the Securities Exchange Act of 1934 applies to fraud "in connection with" two categories of transactions: (1) "the purchase or sale of any security registered on a national securities exchange" or (2) "the purchase or sale of . . . any security not so registered." 15 U. S. C. §78j(b). In this case, the purchased securities are listed only on a few foreign exchanges, none of which has registered with the Securities and Exchange Commission as a "national securities exchange." See §78f. The first category therefore does not apply. Further, the relevant purchases of these unregistered securities took place entirely in Australia and involved only Australian investors. And in accordance with the presumption against extraterritoriality, I do not read the second category to include such transactions. Thus, while state law or other federal fraud statutes, see, *e.g.,* 18 U. S. C. §1341 (mail fraud), §1343 (wire fraud), may apply to the fraudulent activity alleged here to have occurred in the United States, I believe that §10(b) does not. This case does not require us to consider other circumstances.

To the extent the Court's opinion is consistent with these views, I join it.

# SUPREME COURT OF THE UNITED STATES

_____

## No. 08–1191

_____

## ROBERT MORRISON, ET AL., PETITIONERS *v.* NATIONAL AUSTRALIA BANK LTD. ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 24, 2010]

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins, concurring in the judgment.

While I agree that petitioners have failed to state a claim on which relief can be granted, my reasoning differs from the Court's. I would adhere to the general approach that has been the law in the Second Circuit, and most of the rest of the country, for nearly four decades.

## I

Today the Court announces a new "transactional test," *ante*, at 21, for defining the reach of §10(b) of the Securities Exchange Act of 1934 (Exchange Act), 15 U. S. C. §78j(b), and SEC Rule 10b–5, 17 CFR §240.10b–5(b) (2009): Henceforth, those provisions will extend only to "transactions in securities listed on domestic exchanges . . . and domestic transactions in other securities," *ante*, at 18. If one confines one's gaze to the statutory text, the Court's conclusion is a plausible one. But the federal courts have been construing §10(b) in a different manner for a long time, and the Court's textual analysis is not nearly so compelling, in my view, as to warrant the abandonment of their doctrine.

The text and history of §10(b) are famously opaque on the question of when, exactly, transnational securities

frauds fall within the statute's compass. As those types of frauds became more common in the latter half of the 20th century, the federal courts were increasingly called upon to wrestle with that question. The Court of Appeals for the Second Circuit, located in the Nation's financial center, led the effort. Beginning in earnest with *Schoenbaum* v. *Firstbrook*, 405 F. 2d 200, rev'd on rehearing on other grounds, 405 F. 2d 215 (1968) (en banc), that court strove, over an extended series of cases, to "discern" under what circumstances "Congress would have wished the precious resources of the United States courts and law enforcement agencies to be devoted to [transnational] transactions," 547 F. 3d 167, 170 (2008) (internal quotation marks omitted). Relying on opinions by Judge Henry Friendly,[1] the Second Circuit eventually settled on a conduct-and-effects test. This test asks "(1) whether the wrongful conduct occurred in the Unites States, and (2) whether the wrongful conduct had a substantial effect in the United States or upon United States citizens." *Id.,* at 171. Numerous cases flesh out the proper application of each prong.

The Second Circuit's test became the "north star" of §10(b) jurisprudence, *ante*, at 8, not just regionally but nationally as well. With minor variations, other courts converged on the same basic approach.[2] See Brief for United States as *Amicus Curiae* 15 ("The courts have

_____

[1] See, *e.g., IIT, Int'l Inv. Trust* v. *Cornfeld*, 619 F. 2d 909 (CA2 1980); *IIT* v. *Vencap, Ltd.*, 519 F. 2d 1001 (CA2 1975); *Bersch* v. *Drexel Firestone, Inc.*, 519 F. 2d 974 (CA2 1975); *Leasco Data Processing Equip. Corp.* v. *Maxwell*, 468 F. 2d 1326 (CA2 1972).

[2] I acknowledge that the Courts of Appeals have differed in their applications of the conduct-and-effects test, with the consequence that their respective rulings are not perfectly "cohesive." *Ante*, at 10, n. 4. It is nevertheless significant that the other Courts of Appeals, along with the other branches of Government, have "embraced the Second Circuit's approach," *ante*, at 9. If this Court were to do likewise, as I would have us do, the lower courts would of course cohere even more tightly around the Second Circuit's rule.

uniformly agreed that Section 10(b) can apply to a transnational securities fraud either when fraudulent conduct has effects in the United States or when sufficient conduct relevant to the fraud occurs in the United States"); see also 1 Restatement (Third) of Foreign Relations Law of the United States §416 (1986) (setting forth conduct-and-effects test). Neither Congress nor the Securities Exchange Commission (Commission) acted to change the law. To the contrary, the Commission largely adopted the Second Circuit's position in its own adjudications. See *ante*, at 23–24.

In light of this history, the Court's critique of the decision below for applying "judge-made rules" is quite misplaced. *Ante*, at 11. This entire area of law is replete with judge-made rules, which give concrete meaning to Congress' general commands.[3] "When we deal with private actions under Rule 10b–5," then-Justice Rehnquist wrote many years ago, "we deal with a judicial oak which has grown from little more than a legislative acorn." *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 737 (1975). The "'Mother Court'" of securities law tended to that oak. *Id.,* at 762 (Blackmun, J., dissenting) (describing the Second Circuit). One of our greatest jurists—the judge who, "without a doubt, did more to shape the law of securities regulation than any [other] in the country"[4]—was its master arborist.

The development of §10(b) law was hardly an instance of

––––––––––

[3] It is true that "when it comes to 'the scope of [the] conduct prohibited by [Rule 10b–5 and] §10(b), the text of the statute [has] control[led] our decision[s].'" *Ante*, at 12, n. 5 (quoting *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 173 (1994); some brackets in original). The problem, when it comes to transnational securities frauds, is that the text of the statute does not provide a great deal of control. As with any broadly phrased, longstanding statute, courts have had to fill in the gaps.

[4] Loss, In Memoriam: Henry J. Friendly, 99 Harv. L. Rev. 1722, 1723 (1986).

judicial usurpation.  Congress invited an expansive role
for judicial elaboration when it crafted such an open-ended
statute in 1934.  And both Congress and the Commission
subsequently affirmed that role when they left intact the
relevant statutory and regulatory language, respectively,
throughout all the years that followed.  See Brief for
Alecta pensionsförsäkring, ömsesidigt et al. as *Amici
Curiae* 31–33; cf. *Musick, Peeler & Garrett* v. *Employers
Ins. of Wausau*, 508 U. S. 286, 294 (1993) (inferring from
recent legislation Congress' desire to "acknowledg[e]" the
10b–5 action without "entangling" itself in the precise
formulation thereof).  Unlike certain other domains of
securities law, this is "a case in which Congress has en-
acted a regulatory statute and then has accepted, over a
long period of time, broad judicial authority to define
substantive standards of conduct and liability," and much
else besides.  *Stoneridge Investment Partners, LLC* v.
*Scientific-Atlanta, Inc.*, 552 U. S. 148, 163 (2008).

   This Court has not shied away from acknowledging that
authority.  We have consistently confirmed that, in apply-
ing §10(b) and Rule 10b–5, courts may need "to flesh out
the portions of the law with respect to which neither the
congressional enactment nor the administrative regula-
tions offer conclusive guidance."  *Blue Chip*, 421 U. S., at
737.  And we have unanimously "recogniz[ed] a judicial
authority to shape . . . the 10b–5 cause of action," for that
is a task "Congress has left to us."  *Musick, Peeler*, 508
U. S., at 293, 294; see also *id.,* at 292 (noting with ap-
proval that "federal courts have accepted and exercised
the principal responsibility for the continuing elaboration
of the scope of the 10b–5 right and the definition of the
duties it imposes").  Indeed, we have unanimously en-
dorsed the Second Circuit's basic interpretive approach to
§10(b)—ridiculed by the Court today—of striving to "di-

vin[e] what Congress would have wanted," *ante*, at 12.[5]
"Our task," we have said, is "to attempt to infer how the
1934 Congress would have addressed the issue." *Musick,
Peeler*, 508 U. S., at 294.

Thus, while the Court devotes a considerable amount of
attention to the development of the case law, *ante*, at 6–
10, it draws the wrong conclusions. The Second Circuit
refined its test over several decades and dozens of cases,
with the tacit approval of Congress and the Commission
and with the general assent of its sister Circuits. That
history is a reason we should give additional weight to the
Second Circuit's "judge-made" doctrine, not a reason to
denigrate it. "The longstanding acceptance by the courts,
coupled with Congress' failure to reject [its] reasonable
interpretation of the wording of §10(b), . . . argues signifi-
cantly in favor of acceptance of the [Second Circuit] rule
by this Court." *Blue Chip*, 421 U. S., at 733.

## II

The Court's other main critique of the Second Circuit's
approach—apart from what the Court views as its exces-
sive reliance on functional considerations and recon-
structed congressional intent—is that the Second Circuit

─────────

[5] Even as the Court repeatedly declined to grant certiorari on cases
raising the issue, individual Justices went further and endorsed the
Second Circuit's basic approach to determining the transnational reach
of §10(b). See, *e.g., Scherk* v. *Alberto-Culver Co.*, 417 U. S. 506, 529–
530 (1974) (Douglas, J., joined by Brennan, White, and Marshall, JJ.,
dissenting) ("It has been recognized that the 1934 Act, including the
protections of Rule 10b–5, applies when foreign defendants have
defrauded American investors, particularly when . . . they have profited
by virtue of proscribed conduct within our boundaries. This is true
even when the defendant is organized under the laws of a foreign
country, is conducting much of its activity outside the United States,
and is therefore governed largely by foreign law" (citing, *inter alia*,
*Leasco*, 468 F. 2d, at 1334–1339, and *Schoenbaum* v. *Firstbrook*, 405
F. 2d 200, rev'd on rehearing on other grounds, 405 F. 2d 215 (CA2
1968) (en banc))).

has "disregard[ed]" the presumption against extraterritoriality. *Ante*, at 6. It is the Court, however, that misapplies the presumption, in two main respects.

First, the Court seeks to transform the presumption from a flexible rule of thumb into something more like a clear statement rule. We have been here before. In the case on which the Court primarily relies, *EEOC* v. *Arabian American Oil Co.*, 499 U. S. 244 (1991) *(Aramco)*, Chief Justice Rehnquist's majority opinion included a sentence that appeared to make the same move. See *id.,* at 258 ("Congress' awareness of the need to make a clear statement that a statute applies overseas is amply demonstrated by the numerous occasions on which it has expressly legislated the extraterritorial application of a statute"). Justice Marshall, in dissent, vigorously objected. See *id.,* at 261 ("[C]ontrary to what one would conclude from the majority's analysis, this canon is *not* a 'clear statement' rule, the application of which relieves a court of the duty to give effect to all available indicia of the legislative will").

Yet even *Aramco*—surely the most extreme application of the presumption against extraterritoriality in my time on the Court[6]—contained numerous passages suggesting that the presumption may be overcome without a clear directive. See *id.,* at 248–255 (majority opinion) (repeatedly identifying congressional "intent" as the touchstone of the presumption). And our cases both before and after *Aramco* make perfectly clear that the Court continues to give effect to "*all available evidence* about the meaning" of a provision when considering its extraterritorial application, lest we defy Congress' will. *Sale* v. *Haitian Centers Council, Inc.*, 509 U. S. 155, 177 (1993) (emphasis added).[7]

_____

[6] And also one of the most short lived. See Civil Rights Act of 1991, §109, 105 Stat. 1077 (repudiating *Aramco*).

[7] See also, *e.g., Hartford Fire Ins. Co.* v. *California*, 509 U. S. 764

Contrary to JUSTICE SCALIA's personal view of statutory interpretation, that evidence legitimately encompasses more than the enacted text. Hence, while the Court's dictum that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none," *ante*, at 6, makes for a nice catchphrase, the point is overstated. The presumption against extraterritoriality can be useful as a theory of congressional purpose, a tool for managing international conflict, a background norm, a tiebreaker. It does not relieve courts of their duty to give statutes the most faithful reading possible.

Second, and more fundamentally, the Court errs in suggesting that the presumption against extraterritoriality is fatal to the Second Circuit's test. For even if the presumption really were a clear statement (or "clear indication," *ante*, at 6, 16) rule, it would have only marginal relevance to this case.

It is true, of course, that "this Court ordinarily construes

_____

(1993) (declining to apply presumption in assessing question of Sherman Act extraterritoriality); *Smith* v. *United States*, 507 U. S. 197, 201–204 (1993) (opinion for the Court by Rehnquist, C. J.) (considering presumption "[l]astly," to resolve "any lingering doubt," after considering structure, legislative history, and judicial interpretations of Federal Tort Claims Act); cf. *Sale*, 509 U. S., at 188 (stating that presumption "has special force when we are construing treaty and statutory provisions that," unlike §10(b), "may involve foreign and military affairs for which the President has unique responsibility"); Dodge, Understanding the Presumption Against Extraterritoriality, 16 Berkeley J. Int'l L. 85, 110 (1998) (explaining that lower courts "have been unanimous in concluding that the presumption against extraterritoriality is not a clear statement rule"). The Court also relies on *Microsoft Corp.* v. *AT&T Corp.*, 550 U. S. 437, 455–456 (2007). *Ante*, at 16. Yet *Microsoft*'s articulation of the presumption is a far cry from the Court's rigid theory. "As a principle of general application," *Microsoft* innocuously observed, "we have stated that courts should 'assume that legislators take account of the legitimate sovereign interests of other nations when they write American laws.'" 550 U. S., at 455 (quoting *F. Hoffmann-La Roche Ltd* v. *Empagran S. A.*, 542 U. S. 155, 164 (2004)).

ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations," *F. Hoffmann-La Roche Ltd* v. *Empagran S. A.*, 542 U. S. 155, 164 (2004), and that, absent contrary evidence, we presume "Congress is primarily concerned with domestic conditions," *Foley Bros., Inc.* v. *Filardo*, 336 U. S. 281, 285 (1949). Accordingly, the presumption against extraterritoriality "provides a sound basis for concluding that Section 10(b) does not apply when a securities fraud with no effects in the United States is hatched and executed entirely outside this country." Brief for United States as *Amicus Curiae* 22. But that is just about all it provides a sound basis for concluding. And the conclusion is not very illuminating, because no party to the litigation disputes it. No one contends that §10(b) applies to wholly foreign frauds.

Rather, the real question in this case is how much, and what kinds of, *domestic* contacts are sufficient to trigger application of §10(b).[8] In developing its conduct-and-effects test, the Second Circuit endeavored to derive a solution from the Exchange Act's text, structure, history, and purpose. Judge Friendly and his colleagues were well aware that United States courts "cannot and should not expend [their] resources resolving cases that do not affect Americans or involve fraud emanating from America." 547 F. 3d, at 175; see also *id.,* at 171 (overriding concern is "'whether there is sufficient United States involvement'" (quoting *Itoba Ltd.* v. *Lep Group PLC*, 54 F. 3d 118, 122 (CA2 1995))).

The question just stated does not admit of an easy an-

---

[8] Cf. Dodge, 16 Berkeley J. Int'l L., at 88, n. 25 (regardless whether one frames question as "whether the presumption against extraterritoriality should apply [or] whether the regulation is extraterritorial," "one must ultimately grapple with the basic issue of what connection to the United States is sufficient to justify the assumption that Congress would want its laws to be applied").

swer. The text of the Exchange Act indicates that §10(b) extends to at least some activities with an international component, but, again, it is not pellucid as to which ones.[9] The Second Circuit draws the line as follows: §10(b) extends to transnational frauds "only when substantial acts in furtherance of the fraud were committed within the United States," *SEC* v. *Berger*, 322 F. 3d 187, 193 (CA2 2003) (internal quotation marks omitted), or when the fraud was "'intended to produce'" and did produce "'detrimental effects within'" the United States, *Schoenbaum*, 405 F. 2d, at 206.[10]

This approach is consistent with the understanding

———————

[9] By its terms, §10(b) regulates "interstate commerce," 15 U. S. C. §78j, which the Exchange Act defines to include "trade, commerce, transportation, or communication . . . between any foreign country and any State, or between any State and any place or ship outside thereof." §78c(a)(17). Other provisions of the Exchange Act make clear that Congress contemplated some amount of transnational application. See, *e.g.,* §78b(2) (stating, in explaining necessity for regulation, that "[t]he prices established and offered in [securities] transactions are generally disseminated and quoted throughout the United States and foreign countries and constitute a basis for determining and establishing the prices at which securities are bought and sold"); §78dd(b) (exempting from regulation foreign parties "*unless*" they transact business in securities "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate to prevent the evasion of this chapter" (emphasis added)); see also *Schoenbaum*, 405 F. 2d, at 206–208 (reviewing statutory text and legislative history). The Court finds these textual references insufficient to overcome the presumption against extraterritoriality, *ante*, at 13–15, but as explained in the main text, that finding rests upon the Court's misapplication of the presumption.

[10] The Government submits that a "transnational securities fraud violates Section 10(b) if significant conduct material to the fraud's success occurs in the United States." Brief for United States as *Amicus Curiae* 6. I understand the Government's submission to be largely a repackaging of the "conduct" prong of the Second Circuit's test. The Government expresses no view on that test's "effects" prong, as the decision below considered only respondents' conduct. See *id.,* at 15, n. 2; 547 F. 3d 167, 171 (CA2 2008).

shared by most scholars that Congress, in passing the Exchange Act, "expected U. S. securities laws to apply to certain international transactions or conduct." Buxbaum, Multinational Class Actions Under Federal Securities Law: Managing Jurisdictional Conflict, 46 Colum. J. Transnat'l L. 14, 19 (2007); see also *Leasco Data Processing Equip. Corp.* v. *Maxwell*, 468 F. 2d 1326, 1336 (CA2 1972) (Friendly, J.) (detailing evidence that Congress "meant §10(b) to protect against fraud in the sale or purchase of securities whether or not these were traded on organized United States markets"). It is also consistent with the traditional understanding, regnant in the 1930's as it is now, that the presumption against extraterritoriality does not apply "when the conduct [at issue] occurs within the United States," and has lesser force when "the failure to extend the scope of the statute to a foreign setting will result in adverse effects within the United States." *Environmental Defense Fund, Inc.* v. *Massey*, 986 F. 2d 528, 531 (CADC 1993); accord, Restatement (Second) of Foreign Relations Law of the United States §38 (1964–1965); cf. *Small* v. *United States*, 544 U. S. 385, 400 (2005) (THOMAS, J., joined by SCALIA and KENNEDY, JJ., dissenting) (presumption against extraterritoriality "lend[s] no support" to a "rule restricting a federal statute from reaching conduct *within U. S. borders*"); *Continental Ore Co.* v. *Union Carbide & Carbon Corp.*, 370 U. S. 690, 705 (1962) (presumption against extraterritoriality not controlling "[s]ince the activities of the defendants had an impact within the United States and upon its foreign trade"). And it strikes a reasonable balance between the goals of "preventing the export of fraud from America," protecting shareholders, enhancing investor confidence, and deterring corporate misconduct, on the one hand, and conserving United States resources and limiting conflict with

foreign law, on the other.[11]  547 F. 3d, at 175.

Thus, while §10(b) may not give any "clear indication" on its face as to how it should apply to transnational securities frauds, *ante*, at 6, 16, it does give strong clues that it should cover at least some of them, see n. 9, *supra*. And in my view, the Second Circuit has done the best job of discerning what sorts of transnational frauds Congress meant in 1934—and still means today—to regulate. I do not take issue with the Court for beginning its inquiry with the statutory text, rather than the doctrine in the Courts of Appeals. Cf. *ante*, at 18, n. 9. I take issue with the Court for beginning *and ending* its inquiry with the statutory text, when the text does not speak with geographic precision, and for dismissing the long pedigree of, and the persuasive account of congressional intent embodied in, the Second Circuit's rule.

Repudiating the Second Circuit's approach in its entirety, the Court establishes a novel rule that will foreclose private parties from bringing §10(b) actions whenever the relevant securities were purchased or sold abroad and are not listed on a domestic exchange.[12]  The real motor of the

—————

[11] Given its focus on "domestic conditions," *Foley Bros., Inc.* v. *Filardo*, 336 U. S. 281, 285 (1949), I expect that virtually all "'foreign-cubed'" actions—actions in which "(1) *foreign* plaintiffs [are] suing (2) a *foreign* issuer in an American court for violations of American securities laws based on securities transactions in (3) *foreign* countries," 547 F. 3d, at 172—would fail the Second Circuit's test. As they generally should. Under these circumstances, the odds of the fraud having a substantial connection to the United States are low. In recognition of the Exchange Act's focus on American investors and the novelty of foreign-cubed lawsuits, and in the interest of promoting clarity, it might have been appropriate to incorporate one bright line into the Second Circuit's test, by categorically excluding such lawsuits from §10(b)'s ambit.

[12] The Court's opinion does not, however, foreclose the Commission from bringing enforcement actions in additional circumstances, as no issue concerning the Commission's authority is presented by this case. The Commission's enforcement proceedings not only differ from private §10(b) actions in numerous potentially relevant respects, see Brief for

Court's opinion, it seems, is not the presumption against extraterritoriality but rather the Court's belief that transactions on domestic exchanges are "the focus of the Exchange Act" and "the objects of [its] solicitude." *Ante*, at 17, 18. In reality, however, it is the "public interest" and "the interests of investors" that are the objects of the statute's solicitude. *Europe & Overseas Commodity Traders, S. A.* v. *Banque Paribas London*, 147 F. 3d 118, 125 (CA2 1998) (citing H. R. Rep. No. 1838, 73d Cong., 2d Sess., 32–33 (1934)); see also *Basic Inc.* v. *Levinson*, 485 U. S. 224, 230 (1988) ("The 1934 Act was designed to protect investors against manipulation of stock prices" (citing S. Rep. No. 792, 73d Cong., 2d Sess., 1–5 (1934)); *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 195 (1976) ("The 1934 Act was intended principally to protect investors . . . "); S. Rep. No. 1455, 73d Cong., 2d Sess., 68 (1934) ("The Securities Exchange Act of 1934 aims to protect the interests of the public against the predatory operations of directors, officers, and principal stockholders of corporations . . . "). And while the clarity and simplicity of the Court's test may have some salutary consequences, like all bright-line rules it also has drawbacks.

Imagine, for example, an American investor who buys shares in a company listed only on an overseas exchange. That company has a major American subsidiary with executives based in New York City; and it was in New York City that the executives masterminded and implemented a massive deception which artificially inflated the stock price—and which will, upon its disclosure, cause the

_____

United States as *Amicus Curiae* 12–13, but they also pose a lesser threat to international comity, *id.,* at 26–27; cf. *Empagran*, 542 U. S., at 171 ("'[P]rivate plaintiffs often are unwilling to exercise the degree of self-restraint and consideration of foreign governmental sensibilities generally exercised by the U. S. Government'" (quoting Griffin, Extraterritoriality in U. S. and EU Antitrust Enforcement, 67 Antitrust L. J. 159, 194 (1999; alteration in original)).

price to plummet. Or, imagine that those same executives go knocking on doors in Manhattan and convince an unsophisticated retiree, on the basis of material misrepresentations, to invest her life savings in the company's doomed securities. Both of these investors would, under the Court's new test, be barred from seeking relief under §10(b).

The oddity of that result should give pause. For in walling off such individuals from §10(b), the Court narrows the provision's reach to a degree that would surprise and alarm generations of American investors—and, I am convinced, the Congress that passed the Exchange Act. Indeed, the Court's rule turns §10(b) jurisprudence (and the presumption against extraterritoriality) on its head, by withdrawing the statute's application from cases in which there is *both* substantial wrongful conduct that occurred in the United States *and* a substantial injurious effect on United States markets and citizens.

## III

In my judgment, if petitioners' allegations of fraudulent misconduct that took place in Florida are true, then respondents may have violated §10(b), and could potentially be held accountable in an enforcement proceeding brought by the Commission. But it does not follow that shareholders who have failed to allege that the bulk or the heart of the fraud occurred in the United States, or that the fraud had an adverse impact on American investors or markets, may maintain a private action to recover damages they suffered abroad. Some cases involving foreign securities transactions have extensive links to, and ramifications for, this country; this case has Australia written all over it. Accordingly, for essentially the reasons stated in the Court of Appeals' opinion, I would affirm its judgment.

The Court instead elects to upend a significant area of securities law based on a plausible, but hardly decisive,

construction of the statutory text. In so doing, it pays short shrift to the United States' interest in remedying frauds that transpire on American soil or harm American citizens, as well as to the accumulated wisdom and experience of the lower courts. I happen to agree with the result the Court reaches in this case. But "I respectfully dissent," once again, "from the Court's continuing campaign to render the private cause of action under §10(b) toothless." *Stoneridge*, 552 U. S., at 175 (STEVENS, J., dissenting).